Selma STONE, Individually and on Behalf of All Others Similarly Situated, Plaintiffs,

v.

LIFE PARTNERS HOLDINGS, INC., Brian D. Pardo, R. Scott Peden, and David M. Martin, Defendants.

Civil Action No. DR–11–CV–16–AM.

United States District Court, W.D. Texas, Del Rio Division.

Signed May 15, 2014.

Reed R. Kathrein, Hagens Berman Sobol Shapiro LLP, Berkeley, CA, Steve W. Berman, Hagens Berman Sobol Shapiro LLP, Seattle, WA, Joseph E. White, III, Lester R. Hooker, Saxena White, P.A., Boca Raton, FL, Roger F. Claxton, Law Office of Roger F. Claxton, Dallas, TX, for Plaintiffs.

Rory M. Ryan, Baylor Law School, Waco, TX, for Defendants.

## ORDER

ALIA MOSES, District Judge.

Before the Court is a consolidated securities class action lawsuit against Life Partners Holdings, Inc. ("Life Partners"), brought pursuant to section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b–5 promulgated thereunder, and section 20 of the Exchange Act.[1] After the Plaintiffs filed their First Amended Complaint (ECF No. 42), the Defendants Life Partners Holdings, Inc., Brian D. Pardo, R. Scott Peden, and David M. Martin filed a Motion to Dismiss First Amended Complaint and Brief in Support Thereof (ECF No. 46). The Court held a hearing on the Defendants' motion to dismiss to ensure that it is fully apprised of the factual and legal issues implicated therein. (ECF No. 69.) After carefully considering the arguments presented in the motion to dismiss, along with the Plaintiffs' Opposition to Defendants' Motion to Dismiss (ECF No. 50) and the Defendants' Reply in Support of Defendants' Motion to Dismiss First Amended Complaint (ECF No. 51), the Court hereby **DENIES** the Defendants' motion for the following reasons.

## I. GENERAL BACKGROUND [2]

█ Life Partners, founded by Brian Pardo in 1991, is a Waco-based, publicly-

1. Rule 10b–5, in pertinent part, provides:
 It shall be unlawful for any person, directly or indirectly ... (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. 240.10b–5. Section 20(a) further imposes joint and several liability upon per-

sons who "control" defendants who have acted in violation of section 10(b) and Rule 10b–5. *See* 15 U.S.C. § 78t(a).

2. The following facts are related here as presented in the First Amended Complaint. (*See* Am. Compl., ECF No. 42.) In ruling on a motion to dismiss a section 10(b) action, courts must first, "as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true," and second, "consider the complaint in its entirety." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d

traded company listed on the NASDAQ exchange. Through its subsidiary, Life Partners, Inc., Life Partners operates in the secondary life insurance market as a purchasing agent in transactions involving the sale of existing life insurance policies to unrelated investors.

Life Partners' business model is as follows: (1) Life Partners identifies elderly and terminally ill individuals willing to sell their interests in their life insurance policies; (2) it performs a life expectancy analysis for each individual in possession of a policy that Life Partners intends to broker; and (3) it resells fractional interests in each policy to investors who buy the policy at a discounted purchase price. Immediately upon the purchase and transfer of the policy rights, Life Partners collects a brokerage fee; the exact amount of the brokerage fee, however, is built into the total cost of the policy and is thus unknown to the investor. The investor then holds the policy, paying the policy premiums as they come due from money escrowed at the time of purchase. The investor subsequently receives the payout of the life insurance benefit upon the death of the insured. The investor's profit derives from the difference between the discounted purchase price of the policy and the death benefit paid, minus transaction costs and additional premiums paid. Because Life Partners only receives a commission for each policy brokered, its income is dependent upon the volume of purchases that it brokers, not on the levels of returns achieved by investors.

On February 10, 2012, three representative plaintiffs, on behalf of purchasers of Life Partners common stock between May 26, 2006 and June 17, 2011 (the "class period"), commenced this class action securities fraud lawsuit against Life Partners and three Life Partners directors and officers—Brian D. Pardo, R. Scott Peden, and David M. Martin (collectively, the "Defendants")—for violations of federal securities laws.[3] Brian Pardo, founder of Life Partners, has served as a corporate director, president, and CEO of the company since 1991; R. Scott Peden, who served as both the company's vice president and general counsel from the time of its inception, has since served as the company's secretary and general counsel; and David M. Martin began acting as the company's CFO in February of 2008.[4]

At the core of the First Amended Complaint ("amended complaint") is the Plaintiffs' allegation that Life Partners' business model was fraudulent and unsustainable and that, despite knowing this, the three individual Defendants misrepresented the financial condition of the company to its shareholders in public statements made in filings with the Securities and Exchange Commission ("SEC"), in

---

179 (2007). Because the amended complaint spans more than 150 pages, this Court has refrained from recounting every allegation in the present order. Despite this, the Court has considered "the [amended] complaint in its entirety," as it is required to do. *Id.*

**3.** The Plaintiffs have specified that the class period begins with the filing of Life Partners' annual 10–KSB with the SEC on May 26, 2006, and ends on June 17, 2011, the date on which Life Partners' outside auditor, the company Eide Bailly, disclaimed Life Partners' prior financial statements.

**4.** The Court notes that the amended complaint at one point refers to Peden as the president of Life Partners. However, because Pardo has been the president since 1991, and because the amended complaint later alleges that Peden was the secretary, the Court interprets this to be an error, and understands Peden to have served only as the vice president and secretary of the corporation. (*See* Am. Compl., ECF No. 42 at 10, para. 30(b).)

press releases, and during public conference calls.

To support their contention that Life Partners was built on a fraudulent business model, the Plaintiffs allege that Life Partners, using one doctor with little actuarial experience, routinely underestimated the life expectancies of insured individuals. Its underestimated life expectancies then caused the company to overstate the value—or expected investment return rate—of the individual life insurance policies that it brokered to its investors. As a result, the entire company was built on the marketing and selling of what was, in effect, a sham product. Despite having knowledge of this fact, the Defendants held Life Partners out to be a sustainable and valuable company whose publicly-traded stocks were worth purchasing.

The Plaintiffs also assert that Life Partners engaged in a scheme to improperly recognize its company's revenue in violation of generally accepted accounting principles ("GAAP") and SEC regulations. This improperly recorded revenue was then reported in the company's public filings with the SEC, thereby bolstering the appearance of the company's value to external investors. As a direct and proximate result of the Defendants' alleged misstatements, the Plaintiffs contend that they suffered damages in connection with their purchases of Life Partners common stock at an artificially-inflated price during the class period.

Finally, the Plaintiffs allege that the Defendants, by reason of their positions as officers and/or directors of Life Partners and their ownership of Life Partners stock, had the power and authority to cause Life Partners to engage in its wrongful conduct and are thus also liable as controlling persons pursuant to section 20(a) of the Exchange Act.

In lieu of an answer, the Defendants filed the present motion to dismiss the Plaintiffs' claims contained within the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that the Plaintiffs have failed to state a claim upon which relief can be granted. According to the Defendants, the Plaintiffs have failed to allege elements of a cause of action under section 10(b) of the Exchange Act with sufficient particularity. And because the Plaintiffs have failed to state a claim under section 10(b), the Plaintiffs necessarily cannot state a claim under section 20 of the Exchange Act.

## II. GENERAL DISMISSAL STANDARD

"A pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief...." Fed.R.Civ.P. 8(a)(2). Federal Rule of Civil Procedure 12(b)(6) authorizes the dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." Fed. R. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 663, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Determining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Iqbal,* 556 U.S. at 663–64, 129 S.Ct. 1937.

▪ A Rule 12(b)(6) motion to dismiss "is viewed with disfavor and is rarely granted." *Kaiser Alum. & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982) (quotation omitted). Therefore, the complaint must be

584

liberally construed in the plaintiff's favor, all reasonable inferences must be drawn in favor of the plaintiff's claims, and the factual allegations of the complaint must be taken as true. *See Campbell v. Wells Fargo Bank,* 781 F.2d 440, 442 (5th Cir.1986). Notwithstanding, "on a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (quoting *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). Instead, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* That is, there must be "a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id.* at 555 n. 3, 127 S.Ct. 1955 (citing Fed.R.Civ.P. 8(a)(2)). "[W]here the well-pleaded facts do not permit the court to infer more than a mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937 (alteration omitted) (quoting Fed.R.Civ.P. 8(a)(2)).

■ In ruling on a Rule 12(b)(6) motion to dismiss, "courts must consider the complaint in its entirety," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007), and generally should not go beyond the pleadings, limiting their inquiry to the facts stated in the complaint. *See* Fed. R.Civ.P. 12(d); *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1017 (5th Cir. 1996). However, to evaluate a Rule 12(b)(6) motion to dismiss, a court may also consider: (1) any attachment to the pleadings, *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498 (5th Cir. 2000); (2) documents incorporated into the complaint by reference, *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008); (3) documents that a defendant attaches to its motion to dismiss if those documents are referred to in the plaintiff's complaint and are central to the plaintiff's claim, *see Scanlan v. Tex. A & M Univ.,* 343 F.3d 533, 536 (5th Cir.2003); (4) matters of public record, *Cinel v. Connick,* 15 F.3d 1338, 1343 n. 6 (5th Cir.1994); and (5) information subject to judicial notice. *Dorsey,* 540 F.3d at 338; *see also Tellabs,* 551 U.S. at 322, 127 S.Ct. 2499 (stating that when ruling on Rule 12(b)(6) motions to dismiss, in addition to the complaint, courts ordinarily examine "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").

■■ In addition, because "[s]ection 10(b) claims sound in fraud," a plaintiff must plead the Rule 10b–5 elements with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. *Coates v. Heartland Wireless Commc'ns, Inc.,* 26 F.Supp.2d 910, 914 (N.D.Tex.1998) (citing *Shushany v. Allwaste, Inc.,* 992 F.2d 517, 520–21 (5th Cir.1993)). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b).

## III. DISCUSSION

### A. Section 10(b) Claims

■ In their motion to dismiss, the Defendants first argue that the Plaintiffs have failed to plead a claim under section 10(b) with sufficient particularity. In order to plead a cause of action under section 10(b) of the Exchange Act and Rule 10b–5, a plaintiff must allege, in connection with the purchase or sale of securities, "'(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiffs'] injury.'" *Nathenson v. Zonagen Inc.,* 267 F.3d 400, 407 (5th Cir.2001) (alterations in original) (quoting *Tuchman v. DSC Commc'ns Corp.,* 14

F.3d 1061, 1067 (5th Cir.1994)); *see also Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (giving the elements for making out a section 10(b) claim).

The Private Securities Litigation Reform Act (PSLRA), which incorporates Rule 9(b) requirements for pleading a claim under Rule 10b–5, also requires a plaintiff to: "(1) specify each statement alleged to have been misleading ... (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.,* why the statement is fraudulent." *ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 350 (5th Cir.2002) (interpreting 15 U.S.C. § 78u–4(b)). In other words, for each misleading statement, the Plaintiff must allege the "who, what, when, where, and how." *Id.* at 350. Where the complaint fails to specify the foregoing, the district court must dismiss the complaint. 15 U.S.C. § 78u–4(b)(3).

### 1. Allegations of Material False and Misleading Statements and Omissions

The first issue the Defendants raise with the amended complaint is whether the Plaintiffs have adequately alleged that the Defendants made material false and misleading statements and omissions. The amended complaint alleges that during the class period, Life Partners and its directors made numerous discrete communications—in particular, press releases, conference calls, and filings with the SEC—each containing several material misrepresentations and omissions. These misrepresentations and omissions purportedly artificially inflated the price of Life Partners stock on the open market, and are one of two types: that (1) Life Partners misrepresented the integrity of its business model, and (2) Life Partners misrepresented its revenue recognition system.

In demonstrating that the Defendants were relying on an unsustainable business model, the Plaintiffs allege that the Defendants utilized the services of a single doctor with little actuarial experience who routinely underestimated the life expectancies of insured individuals. The underestimated life expectancies calculated by the doctor caused the company to Overstate the value—or expected investment return rate—of the individual life insurance policies that it brokered to its investors.

The Plaintiffs also allege that the Defendants made material misrepresentations about Life Partners' revenue recognition policy. GAAP regulations require a company to report earnings only once they are both "realized or realizable" and "earned," and they further require a company to recognize an impairment loss if the carrying amount is not recoverable and exceeds its fair value. The Plaintiffs, however, allege that despite the Defendants' representations in SEC forms that Life Partners followed these regulations, they actually improperly recognized revenue at an earlier period of time and failed to properly calculate impairments, thus distorting Life Partners' actual revenues.

The Defendants do not dispute the materiality of any misrepresentations of their revenue recognition policy.[5] Rather, they argue that the Plaintiffs have failed to

---

**5.** Instead, the Defendants claim they lacked the requisite scienter to trigger liability under section 10(b). Thus, the Court addresses this issue *infra* when addressing the element of scienter.

adequately allege that they made any representations that would qualify as misstatements or omissions of material fact under section 10(b) with regards to its business model. According to the Defendants, any statements cited by the Plaintiffs were either truthful, not material, or protected by the PSLRA's safe harbor provision.[6]

■■■■■ After carefully reviewing the amended complaint, the Court finds the allegations adequate to survive a motion to dismiss. A misstatement or omission is "of material fact" if there is " 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)(quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). "Materiality is not judged in the abstract, but in light of the surrounding circumstances." *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 866 (5th Cir.2003) (quotation omitted). "Accordingly, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 248 (5th Cir.2009).

As background into its business model, Life Partners identified potential investment opportunities in life insurance policies. For each life insurance policy, Life Partners performed an in-house life expectancy (or "LE") analysis of the insured individual policyholder. According to the Plaintiffs, the life expectancy of the insured is the most important factor in calculating the expected internal rate of return ("IRR") of an investment in an existing life insurance policy, with the IRR being the annual interest rate achieved by an investor. Essentially, the IRR is a function of the timing and amount of cash returned on an investment relative to the purchase price of the investment. If the LE of the insured is calculated correctly, the insured will pass away at the predicted moment and the investor will receive his expected return on the investment. However, if the predicted LE is shorter than the actual lifespan of the insured— i.e., if the death of the insured occurs at a later than expected date—the investor will receive less than his expected return.

The Plaintiffs describe in detail Life Partners' departure from the industry standard in calculating its life expectancy estimates. Prior to 1999, Life Partners employed one doctor, Dr. Jack Kelly, to assess the LE of insured individuals for every policy the company intended to broker. As a co-founder and part owner of Life Partners, Dr. Kelly had an inherent financial interest in the corporation. After Dr. Kelly's unexpected death in 1999, Brian Pardo immediately hired Dr. Kelly's former officemate, Dr. Donald T. Cassidy, to replace Dr. Kelly in rendering Life Partners' life expectancy estimates. According to the Plaintiffs, Pardo met Dr. Cassidy for the first time at Dr. Kelly's funeral, and he never investigated whether Dr. Cassidy had the requisite actuarial experience to act as a life expectancy underwriter. Pardo simply instructed Dr. Cassidy to "review Kelly's life expectancy assessments to determine 'how they were doing it.' " (Am. Compl., ECF No. 42 at 20, para. 58.)

---

**6.** Under the safe harbor provision contained in section 21E of the PSLRA, discussed *infra,* statements that are "forward-looking" are exempted from being actionable under section 10(b) if certain conditions are met.

Shortly following the funeral, Life Partners began sending Dr. Cassidy policies for which Life Partners sought LE calculations, paying Dr. Cassidy $500 for each policy that the company decided to purchase for resale using the life expectancy estimates provided by him. Beginning in February 18, 2008, Life Partners began to pay Dr. Cassidy an additional $15,000 per month as a retainer fee. The Plaintiffs further allege that Dr. Cassidy was the only source of Life Partners' life expectancy calculations, and that at the time he was hired by Life Partners, he had no previous experience rendering LEs, nor any actuarial or professional training on the generation of life expectancy estimates. Furthermore, he had never taken any courses nor received professional training in the area of performing life expectancy calculations, and he allegedly never researched the methodology used by life settlement underwriters in the industry.

Despite this, Dr. Cassidy initially provided 50–80 life expectancy estimates in a work week, dedicating three days per week to the process. Accordingly, he spent approximately 17–27 minutes to perform a complete evaluation of an insured's medical history and to calculate an estimated life expectancy. By November of 2008, Dr. Cassidy stated that he took, on average, only 7–14 minutes to perform each life expectancy estimate. Essentially, Life Partners employed a single, wholly unqualified person to quickly perform the most crucial role in a high volume, multimillion dollar business.

In addition, the Plaintiffs allege that Dr. Cassidy used a flawed methodology in rendering Life Partners' LEs. According to two letters written by Dr. Cassidy to Life Partners in March 2002 and May 2009, Dr. Cassidy relied on a census table published by the U.S. Department of Health and Human Services ("HHS") to help him generate his life expectancy estimates, as opposed to the Valuation Basic Table ("VBT"), which is the standard method used in the industry. Whereas the HHS table provides average life expectancy estimates for the population at large, the VBT table provides average life expectancy estimates for insured individuals only, who on average have longer life expectancies than the general population. Additionally, Dr. Cassidy used outdated mortality tables and failed to take into consideration significant changes in medical technology in generating his LEs, which practice deviated significantly from the industry standard.

Despite Dr. Cassidy's reliance on the HHS table, Peden misrepresented to an investor in October of 2008 that Life Partners' LEs were based on the 2008 VBT table as opposed to the HHS table. In November of 2008, Peden made this same misrepresentation to the company's network of independent buyers' agents who helped to broker the policies.

In assessing the accuracy of Dr. Cassidy's LEs, the Plaintiffs allege that for all policies Life Partners brokered between 2000 and 2005, the average calculated LE was 3.8 years, and for all policies the company brokered between 2000 and 2010, the average LE was 4.6 years. Yet from the universe of policies from which Dr. Cassidy's success rate is measurable, 88% of the policies exceeded the LE in 2006 and 2007, 89% of the policies exceeded the LE in 2008, 90% exceeded the LE in 2009, and 91% did so in 2010. The Plaintiffs assert that had Dr. Cassidy employed sound actuarial practices in line with the industry standard, the average LE for policies brokered between 2000 and 2005 should have been at least 11.8 years, and the average LE for policies brokered between 2000 and 2010 should have been 13.6 years.

The Plaintiffs also allege that Life Partners charged brokerage fees that, at more than 14% of a policy's face value, were much higher than the market average, which was generally the " 'lesser of 6% of a policy's face value or 30% of the gross sales price.'" (Am. Compl., ECF No. 42 at 2, para. 5.) Life Partners never communicated the percentage that its fee constituted—its fee being the difference between the price paid to the seller of the policy and the price paid by the purchaser—to its investors, who were never told how much a seller received for his or her policy. According to the Plaintiffs, Life Partners' method of routinely underestimating LEs allowed the company to remain competitive in the secondary market for life insurance policies despite its greater-than-average fees. Due to the lower-than-average LE that Life Partners calculated for each policyholder, each policy appeared to offer a higher rate of return than it actually carried. Accordingly, each investor unknowingly paid more than market rate for a policy, thereby allowing the company to take a fee of 14% or more of a policy's face value.

For years, Life Partners' business practices went relatively unnoticed. And from before the start of the class period in 2006 to early 2009, stock prices rose to record levels from $2.19[7] a share to $22.50 per share. Eventually, however, beginning in early 2009, various news sources began to scrutinize Life Partners' business model, conjecturing that Dr. Cassidy's life expectancy estimates were largely underestimated. The Defendants attempted to control damage via their own press releases, assuring the public that Life Partners re-mained a viable business. Stock prices eventually began to slide, however.

In addition, the SEC began to investigate Life Partners, issuing several Wells Notices to the company in 2011 notifying it of suspected malfeasance in connection to both its underestimation of life expectancy estimates and its unorthodox accounting practices. Also, in June of 2011, Life Partners disclosed that Ernst and Young, the company's independent auditor, had resigned after informing Life Partners that its internal revenue recognition policies were not in accordance with accounting principles, and that a restatement of previously reported financial statements was in order. Ernst and Young accordingly disclaimed its approval of the company's 2010 financial statements, and refused to sign off on its 2011 ones.[8] On June 17, 2011, the company's former outside auditor, Eide Bailly, echoed Ernst and Young's sentiments and also withdrew and disclaimed its previous clean audit opinion of the company's 2009 financial statements. With the close of the class period on Friday, June 17, 2011, the company's stock prices had slipped significantly. By the next open trading day on Monday, June 20, 2011, Life Partners stock was valued at just $3.82 a share.

After reviewing the Plaintiffs' complaint, the Court finds these allegations more than adequate to meet the particularity requirement of Rule 10(b). It is certainly material to a potential investor in Life Partners' stock to know that Life Partners employed one doctor who hastily reviewed a large quantity of life insurance policies using non-industry standards, and who, in

---

7. The amended complaint notes that this represents a split-adjusted price.

8. Notably, the amended complaint also mentions that Pardo allegedly threatened Ernst and Young following its refusal to sign off on Life Partners' 2011 financial statements, stating that he would "take action". against the auditor unless it were to promptly sign off on the statements "as is." (Am. Compl., ECF No. 42 at 116, para. 227.)

the process, routinely underestimated the LE estimates he generated.

In addition, the Plaintiffs list numerous examples of specific material misrepresentations and omissions about the sustainability of Life Partners' business model, detailing the requisite "who, what, when, where, and why" for each example. These examples come from SEC filings, press releases, public conference calls, and comments made to purchasers of the insurance policies. The statements indicate that Life Partners misrepresented that it used both in-house and outside experts, including medical doctors and published actuarial data, "to foster the integrity of [its] pricing systems," rather than a single unqualified doctor. The statements also indicate that Life Partners withheld information about the accuracy of Dr. Cassidy's LEs and the diminished rates of returns for investors. Rather, they misled the public into believing that Life Partners was built upon a sustainable business model that would continue to grow indefinitely and could withstand any economy.

First, the Plaintiffs point to Life Partners' annual 10–KSB and 10–K forms filed with the SEC on May 26, 2006, May 26, 2007, May 15, 2008, May 29, 2009, and May 12, 2010, which reported Life Partners' financial results for the respective fiscal year.[9] According to the Plaintiffs, Life Partners made the following misleading statement on each of these same forms filed between 2006 and 2010:

> Our Purchasers Depend on Our Ability to Predict Life Expectancies and Set Appropriate Price[s]; If Our Investment Returns Are Not Competitive We May Lose Purchasers; We Must Purchase In Large Numbers

. . . .

If we underestimate the average life expectancies, our purchasers will not realize the returns they seek, demand will fall, and purchasers will invest their funds elsewhere. In addition, amounts escrowed for premiums may be insufficient to keep the policy in force. If we overestimate the average life expectancies, the settlement prices we offer viators and life settlors will fall below market levels, supply will decrease, and viators and life settlers [sic] will opt for other alternatives. Our ability to accurately predict life expectancies is affected by a number of factors, including:

The accuracy of our life expectancy estimations, which must sufficiently account for factors including an insured's age, medical condition, life habits (such as smoking), and geographic location;

Our ability to anticipate and adjust for trends, such as advances in medical treatments, that affect life expectancy data; and

Our ability to balance competing interests when pricing settlements, such as the amounts paid to viators or life settlors, the acquisition costs paid by purchasers, and the compensation paid to ourselves and our referral networks.

*To foster the integrity of our pricing systems, we use both in-house and outside experts, including medical doctors and published actuarial data.* We cannot assure you that, despite our experience in settlement pricing, we will not err by underestimating or overestimating average life expectancies or miscalculating reserve amounts for future premiums. If we do so, we could lose

---

**9.** Life Partners filed 10–KSB forms for years 2006 and 2007, and 10–K forms for years 2008, 2009, and 2010. For the fiscal year ending in 2011, Life Partners filed a notice of late filing with the SEC instead of filing its 10–K within the time-frame captured by the class period.

purchasers or viators and life settlors, and those losses could have a material adverse effect on our business, financial condition, and results of operations.

(Am. Compl., ECF No. 42 at paras. 92, 105, 124, 166, and 193) (bold emphasis and bullet points removed; italic emphasis added.) The Plaintiffs assert that these statements were misleading because Life Partners employed only one medical doctor, Dr. Cassidy, to perform all of its life expectancy calculations. Dr. Cassidy's life expectancies were materially flawed because they were not based on industry standards and systematically underestimated the life expectancies of policy sellers.

The Plaintiffs also point to the MD & A Section of its annual 10–K and 10–KSB forms, which omits that the company's business model was built on the generation of artificially low life expectancy estimates, which was reasonably likely to result in a "materially unfavorable impact on the Company's net revenue from continuing operations." (Am. Compl., ECF No. 42 at 32, para. 91; *see also* paras. 104, 125, 165, and 192.)

In addition to its annual 10–K filings, Life Partners submitted a quarterly 10–QSB or 10–Q statement with the SEC in July, October, and January for the fiscal years ending in 2006 through 2011. The Plaintiffs allege that, with respect to several of the 10–QSB and 10–Q forms—in particular, those filed in October 2007, January 2008, July 2008, October 2008, July 2009, October 2009, January 2010, July 2010, October 2010, and January 2011—the "financial information" contained therein, i.e., the company's reported revenue, "was materially false and misleading when made because, among other things, the reported financial earnings ... were generated through the use of a flawed and unsustainable business model that was only possible in the short term through the use of false LE estimates." (Am. Compl., ECF No. 42 at para. 114; *see also id.* at paras. 117, 131, 136, 174, 179, 183, 197, 204, and 206.)

The May 26, 2006 and May 26, 2007 10–KSB forms were signed by Pardo and Peden in their capacities as president and secretary, respectively. (Am. Compl., ECF No. 42 at 32, para. 90.) The May 15, 2008, May 29, 2009, and May 12, 2010 annual 10–K forms were signed by Brian Pardo, David Martin, and R. Scott Peden. Additionally, Brian Pardo signed a certification included in the May 2006 and 2007 10–KSBs pursuant to the Sarbanes–Oxley Act of 2002 ("SOX"), in which he averred that the annual report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report," and that the financial statements "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of [Life Partners] as of, and for, the periods presented in this annual report." (Am. Compl., ECF No. 42 at 34, para. 93; at 42, para. 106.) Also included with the 2008–2010 10–K filings were SOX certifications signed by Brian Pardo and David Martin, the Chief Financial Officer, which were substantially similar to those contained in the 2006 and 2007 Form 10–Ks.

The Plaintiffs further allege that the Defendants made several press releases and conference calls containing materially false or misleading information or omissions. For example, on March 8, 2007, Defendant Pardo issued a press release over the Business Wire announcing that Life Partners had begun to trade publicly on March 12, 2007 on the NASDAQ Global Market, and further stating that the com-

pany was committed to "sustainable growth in the future." (Am. Compl., ECF No. 42 at 38, para 100.) On June 4, 2007, Life Partners issued a public statement over Business Wire in which it reported its expected financial earnings from the first fiscal quarter. It further proclaimed:

Brian Pardo, Chief Executive Officer, said, "We believe our outstanding performance this quarter is a direct result of the substantial and continuing growth in the life settlement market. Each day, more and more wealthy seniors are realizing they pan turn their unwanted life insurance into cash. This increasing market awareness had made the life settlement market one of the fastest growing segments of the financial services sector. We're very proud to be known as 'The Architect of Life Settlements.'"

(Id. at 44, para. 108.) On June 14, 2007, Life Partners issued a second public statement over Business Wire conveying its actual earnings from the first fiscal quarter, and containing further comments from Brian Pardo:

Brian Pardo, Chief Executive Officer, said, "As these results clearly demonstrate, we believe *our outstanding performance this quarter is a direct result of the continuing growth in the life settlement market coupled with our unique ability to provide excellent service within a very reasonable cost structure.* Our proprietary software and processes benefit not only our clients and shareholders, but the thousands of wealthy seniors that are realizing the financial option we provide by turning their unwanted life insurance into cash. This increasing market awareness has made the life settlement market one of the fastest growing segments of the financial services sector and our expertise and operational efficiency has made Life Partners one of the fastest growing companies within that sector."

(Id. at 45, para. 110) (emphasis added.) On September 26, 2007, Life Partners similarly published its revenues in Business Wire, making the same statement that its "financial results clearly show incredible growth in the life settlement market as well as [Life Partners'] unique ability to provide excellent service within this market at a very reasonable cost structure." (Id. at 47, para. 113.)

On January 14, 2008, Life Partners again issued a press release in Business Wire relating its financial earnings and offering the following assurance:

Brian Pardo, Chief Executive Officer, said, "This has been our strongest quarter ever and we are very pleased with the continuing and substantial growth in revenues and net income. *Because we serve investors in the alternative investment market and our business plan does not rely on debt, we expect Life Partners to remain insulated from the current credit trouble of other financial service companies* and we believe that investors will find our company to be one of the few bright spots within the financial sector."

(Am. Compl., ECF No. 42 at 49–50, para. 116) (emphasis added.) On May 21, 2008, following a dividend announcement, Life Partners released the following statement to Business Wire:

We are delighted to announce this increase in our quarterly dividend, which we feel is reflective of the growth in our company's earnings. During a year when many financial sector companies have cut their dividends, we are exceptionally proud to be able to increase our dividend and continue to build the wealth of our shareholders.

(Id. at 54, para. 126) (emphasis omitted.) On June 16, 2008, Life Partners issued a

press release on Business Wire stating the following:

> Because of our continued growth within the growing life settlement industry, this has been the best quarter in the history of our company. *Our business model deals exclusively with real assets with inherent value and does not rely on credit to provide diversification from the financial markets.* That formula has become extremely attractive to investors and we expect that interest to continue. We expect our strong financial performance to underscore the substantial value of our company when compared to other stocks in the financial services sector.

(*Id.* at 55, para. 129) (emphasis added.) On September 19, 2008, Life Partners issued a press release stating that "for the past two quarters, [Life Partners] has experienced record earnings and its stock continues to be a green in a sea of red." (*Id.* at 58, para. 135) (emphasis omitted.) On November 20, 2008, Life Partners issued the following over Business Wire:

> We are proud that [Life Partners] has demonstrated its sustainable growth ability, even in these turbulent financial times. *We continue to bring value to our clients who are seeking asset-based investments that are not correlated to the financial markets.* Our dividend policy reflects our growth trend and our commitment to bringing value to our shareholders.

(Am. Compl., ECF No. 42 at 62, para. 140) (emphasis added.) On December 5, 2008, Life Partners publicly announced that it had been flagged with a "buy" rating, and qualified this announcement with the following statements:

> *Life settlements generate high returns that are neither economically sensitive nor correlated to other financial markets* or commodity markets.

> . . . .

> Given strong market growth, increasing market share and exceptional financial performance, *we believe [Life Partners] to be meaningfully undervalued and expect it to outperform the market averages over the next 12–18 months.*

(*Id.* at 63, para. 142) (emphasis added.)

On February 11, 2009, Life Partners released a public statement in response to negative press questioning the integrity of Life Partners' business model, viz., "[Life Partners] falls short of the standard of accountability and transparency required of mid-cap Nasdaq companies. From an actuarial perspective, we'd say the odds are this one is terminal." (*See* Am. Compl., ECF No. 42 at 68, para. 150 (quoting the Citron Research report).) Life Partners' public response stated that the report "contained inaccurate assumptions, misinformation and erroneous facts about [the] company." (*Id.* at 69, para. 151.) It further assured its investors, writing,

> We are confident that our business growth will remain strong throughout the remainder of this fiscal year and beyond. We vehemently disagree with the conclusions reached by the author of the report and *believe strongly that our business model will continue to demonstrate the sustainable growth we have exhibited over the last 18 years.*

> *We urge all shareholders to focus on our exceptionally strong business fundamentals* and welcome the opportunity to address any issues or legitimate concerns our shareholders may have.

(*Id.*) (emphasis added.)

On June 16, 2009, Life Partners issued another press release commenting on the financial results from its most recent quarter. Brian Pardo stated the following:

> We are continuing to see growth within the life settlement industry and, as a

leader in this industry, we are continuing to grow as well. As the financial markets remain turbulent, we expect the interest in life settlements to continue. *This is because the gains from life settlements come from the inherent value in these policies and not from market appreciation.* Smart investors realize that life settlements are not susceptible to market fluctuations and are using them to diversify their portfolios from financial market risk.

(Am. Compl., ECF No. 42 at 79, para. 173) (emphasis added.) On July 27, 2009, Life Partners issued the following press release:

> Our board has made it clear that we want [Life Partners] shareholders to share in our success. Because of our unique business model, our shareholders can own a growth stock that also pays a healthy dividend. There aren't many opportunities like that in today's market.

(*Id.* at 83, para. 176.) On September 16, 2009, Brian Pardo publicly stated the following:

> As recent news reports and these numbers show, we continue to see substantial growth in the life settlement industry and in Life Partners specifically. *By concentrating on bringing value to all parties in our life settlement transactions, we ultimately bring value to our shareholders.* Our focus on bringing value is what made us the number one fastest-growing small public company in America according to Fortune Small Business magazine.

(*Id.* at 83, para. 178) (emphasis added.) On December 17, 2009, Life Partners released a public statement, containing the following assurances from Brian Pardo:

> Life Partners has enjoyed continued growth in the life settlement industry because of our superior business model, our industry leadership and our commit-

ment to providing service and value to our clients. As the only publicly traded life settlement provider, *our experience and transparency is important to individual accredited investors, institutional investors and lawmakers who want to know more about how our industry works.* We will continue to provide the leadership and innovation which has made us such an outstanding company.

(*Id.* at 85–86, para. 181) (emphasis added.) Additionally, the company issued the following press release on January 25, 2010:

> Our business is successful because of our commitment to bringing value to our clients. Likewise, we bring value to our shareholders by sharing our success through our consistent history of dividend payments.

(*Id.* at 88, para. 185.) On April 26, 2010, the company stated the following regarding its announced revenues:

> The announcement reflects our company's continuing commitment to share our success with our shareholders. We intend to continue to grow the company while, at the same time, reward our shareholders with a very competitive dividend.

(*Id.* at 90, para. 188.)

In response to a Wall Street Journal article questioning the accuracy of Life Partners' life expectancy estimates, Brian Pardo publicly issued the following statement on December 21, 2010:

> *[E]ach life settlement transaction is structured with the goal of achieving the purchaser's target return* and at a minimum, a positive return even if the insured outlives their LE prediction.

(Am. Compl., ECF No. 42 at 104–05, para. 210) (emphasis added.)

In addition to the numerous press releases made by Life Partners, the compa-

ny's officers held public conference calls during the class period, during which several misleading statements were made with respect to the health of the company. On October 17, 2008, Scott Peden and Brian Pardo held a public conference call. During this call, Brian Pardo made the following statement:

> And because of the nature of Life Partners product and the lack of debt as Life Partners is a company, we had, innately, put a level of armor around the Company to protect ourselves and our shareholders.

(Am. Compl., ECF No. 42 at 61, para. 137.) On January 13, 2009, Scott Peden and Brian Pardo engaged in a public conference call, during which the following exchange ensued:

> Scott Peden: Now let's turn a little bit to recent events. The Bernie Madoff scheme has had a lot of people scared. It's talked about almost every day. Can you explain a little bit how the safeguards in our life settlement transactions prevent the same kind of thing happening with Life Partners? Because I know a lot of people are worried.
>
> Brian Pardo: *And so our job is to find policies, source policies that are qualified, underwrite them, make sure that they meet the underwriting and the investment criteria that the clients are looking for and that we know they are looking for to produce the kinds of returns that we are wanting,* double-digit returns, and in a reasonable timeframe—four, five, six years.

(ECF No. 42 at 66–67, para. 147) (emphasis added.)

These cited examples are materially misleading. In all, there is a substantial likelihood that the disclosure of information about Dr. Cassidy's experience, methodology, and underestimated LEs would have been viewed by a reasonable investor as having significantly altered the total mix of information made available.

The Defendants, however, point the Court to *Hopson v. MetroPCS Communications, Inc.,* No. 3:09–CV–2392–G, 2011 WL 1119727 (N.D.Tex. Mar. 25, 2011), to argue that (1) they were not required to supply any information about Dr. Cassidy, and (2) any representations about Life Partners' financial growth was accurate. In *Hopson,* the plaintiff alleged that a company's public statement that it was "actually accelerating its growth" during "very difficult times" was false because the defendants knew that the company was suffering from the recessionary economy. *Hopson,* 2011 WL 1119727, at *20. The court first noted that the plaintiff completely failed to allege that the statement was false at the time it was made, and commented that "the plaintiff does not dispute that [the company] experienced increases in subscriber growth during the class period; instead, he alleges that the defendants' representations did not reflect the likely effects that the recessionary economy would have on the company's business." *Id.* The court then held that the allegation was conclusory where the plaintiff failed "to allege with particularity 'how' the company was suffering from the recessionary economy, or any basis for inferring that the defendants knew or should have known such was the case yet failed to disclose that fact." *Id.*

In addressing *Hopson,* the Defendants argue that the Plaintiffs have similarly failed to show *how* the "unsustainable business model" caused Life Partners' financial statements to be false and misleading, and by failing to do so, the Plaintiffs have not satisfied the "who, what, when, where, and how" particularity requirements of the PSLRA. In other words, where Life Partners' financial statements accurately disclose the company's historical earnings,

the company's failure to disclose facts about conditions that *could* affect the company's future earnings does not constitute a material misrepresentation.

■■■■ In response, the Plaintiffs argue that the Defendants' failure to disclose the fact of Life Partners' unsustainable business model in its financial statements indeed constitutes an omission of material fact. In making this argument, the Plaintiffs cite to *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228 (5th Cir.2009), and *Rubinstein v. Collins*, 20 F.3d 160 (5th Cir.1994). In *Rubinstein*, the court held that "under rule 10b–5, a duty to speak the full truth arises when a defendant undertakes a duty to say anything. Although such a defendant is under no duty to disclose every fact or assumption underlying a prediction, he must disclose material, firm-specific adverse facts that affect the validity or plausibility of that prediction." *Rubinstein*, 20 F.3d at 170 (quotations and citations omitted). Furthermore, "[t]he omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action." *Lormand*, 565 F.3d at 248. Applying these rules, the Plaintiffs argue that "making inaccurate, incomplete or misleading disclosures regarding [Life Partners'] financial results and the reasons attributed for the results, gave rise to an affirmative duty to disclose the full truth." (Pl.'s Opp., ECF No. 50 at 24.)

The Court finds that *Lormand* and *Rubinstein* are ultimately determinative of the issue. It is true that, similar to *Hopson*, there was nothing technically inaccurate in the financial information reported in the 10–K and 10–Q forms. Indeed, the Defendants accurately reported the revenues the company had realized, even if the revenue was realized on account of falsely advertising the strength of Life Partners' own product.[10] The Plaintiffs, however, allege that these financial statements did much more than simply give an account of the company's earnings—these reports also contained statements concerning the viability, or future sustainability, of Life Partners due to the integrity of the single product that it sold.

■■■■ Again, the Fifth Circuit instructs the Court that under Rule 10b–5 " 'a duty to speak the full truth arises when a defendant undertakes a duty to say anything.' " *Rubinstein*, 20 F.3d at 170 (quoting *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1317 (5th Cir. 1977)).[11] Moreover, context is "instrumental in determining whether a statement is 'misleading.' " *Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 202 (5th Cir.1988). The overall value of a single-product company is integrally linked to the value of the product it peddles. *See, e.g., Nathenson v. Zonagen Inc.*, 267 F.3d 400 (5th Cir.2001) (finding, in the context of scienter, that where a corporation had stated that its value depended on the value of the single product it sold, the CEO knew or should have

**10.** The Court takes the GAAP violation allegations out of the equation for the purposes of this particular argument, which focuses only on whether the reported revenues were false due to the inaccuracy of Life Partners' life expectancy calculations.

**11.** Although the contours of "truthfulness" as defined in *Lormand* and *Rubinstein* were ap-

plied in the context of predictive statements, courts have applied such requirements to statements concerning present facts. *See, e.g., First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir.1977) (holding that a duty to disclose the whole truth arises when a defendant undertakes to disclose material information).

known key information concerning the product at issue). Accordingly, any reasonable, prudent investor would take into consideration information about the actuarial practices used in calculating the value of the single investment product that it sold. In other words, such information is *material* to an investor.

And indeed, Life Partners itself recognized and publicly admitted the importance of selling a quality product—i.e., life insurance policies for insured individuals who had a minimal predicted number of years left to live. For example, in its 10–K forms, the company juxtaposed the following display of risk consciousness—"If we underestimate the average life expectancies, our purchasers will not realize the returns they seek, demand will fall, and purchasers will invest their funds elsewhere"—with the following offer of assurance—"To foster the integrity of our pricing systems, we use both in-house and outside experts, including medical doctors and published actuarial data." It further stated that the accuracy of its calculations turned on its "ability to anticipate and adjust for trends, such as advances in medical treatments, that affect life expectancy data." But where the Defendants knowingly used only one doctor to calculate all of the life expectancies, and this doctor both relied on non-industry standard actuarial tables and outdated tables that failed to take into account medical advances, these statements were actively intended to instill false confidence in the very stock purchasers being deceived.

Furthermore, like the above statements contained in the SEC filings, the company's press releases and public conference calls were also materially misleading in the context and manner in which they were given. Given the allegations that Life Partners was aware that it marketed an overvalued product, the multiple public statements made to bolster the apparent value and stability of the company were entirely misleading. Especially concerning is that in 2009, Pardo still held out to the public that its life insurance policies generated double-digit returns within a four to six year time frame. To blatantly offer assurances of the company's virtuous methods in the face of public criticism in order to gain and maintain investment in a company that one knows is in danger is more than misleading—this constitutes direct lying.

Additionally, Life Partners made several attempts to capitalize on the recessionary economy and the ancillary falling value of many publicly-traded companies in order to bolster the apparent worth of the company. While the fact may be technically true that Life Partners was distinguishable from other companies affected by the financial crisis because it did not engage in a debt market, these statements are nevertheless misleading within their greater context—that Life Partners was built on an unstable product. Ultimately, because the Court finds it to be disingenuous to claim to have a company that, due to its unique business model, is *more* viable than those around it, when the company has knowledge that this same business model is an inherently unsustainable one for different reasons, it deems the above statements to be materially false and misleading for the purposes of stating section 10(b) and Rule 10b–5 claims.

Still, the Defendants insist the above statements are not pleaded with sufficient particularity because the Plaintiffs have failed to plead how *each* statement is misleading, what the person making the misrepresentation obtained thereby, and the reason why the statement was fraudulent. The Court finds no merit to this argument, as it finds that the Plaintiffs have more than adequately offered the reason why

the statement was fraudulent where the company marketed a product that the speakers knew to be overvalued and where the Defendants actively profited as managers of and shareholders in the company.

In a distinctly different argument, the Defendants also assert that several of the misrepresentations alleged in the amended complaint were not made in connection with the sale of Life Partners' stock, but were made in connection with the sale of an actual life insurance policy to an investor. They argue that because at the time of bringing this suit the life insurance policies brokered by Life Partners did not constitute "securities" within the legal definition, any misrepresentation made to a buyer of the second-hand life insurance policy would not constitute a misrepresentation made "in connection with the sale of a security." Accordingly, the Defendants advocate dismissing the suit altogether, arguing that the Plaintiffs have "bootstrapped" claims that properly belong to the purchasers of the life insurance policies bought from Life Partners to a lawsuit brought on behalf of purchasers of common stock in Life Partners as a corporation.

Even if some of the alleged false statements were made to policy investors, rather than stock investors, this fact would not save the Defendants from the present suit. Given the numerous statements described above that were actually made in connection with the sale of Life Partners' common stock, which are registered securities, this Court finds that there exist sufficient misrepresentations made in connection with the sale of securities to survive a motion to dismiss.

■ Finally, the Defendants argue that the multiple statements made during press releases and conference calls are not actionable because they qualify for the safe harbor provision of section 21E of the PSLRA. Under section 21E, a "forward-looking" statement is exempted from being actionable if one of two prongs is satisfied: (1) it is either "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or it is "immaterial," or (2) where the speaker is an individual, the "plaintiff fails to [allege] that the forward-looking statement ... was made with actual knowledge ... that the statement was false or misleading." 15 U.S.C. §§ 77z–2(c)(1), 78z–5(c)(2); *see also Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 371–72 (5th Cir.2004). Furthermore, where the statement is allegedly made by a business entity, in order for the statement to be actionable, the Plaintiffs must plead that the statement was "made by or with the approval of an executive officer of that entity, and "made or approved by such officer [who has] actual knowledge ... that the statement was false or misleading." *Id.*

■ The Court does not find the statements to be exempted under the first prong of the test: that a statement is not actionable if it is either forward-looking and accompanied by meaningful cautionary language, or if it is immaterial. First, the Court first finds the statements to be material, as detailed in full above. Second, after evaluating these statements, the Court does not find many of them to be "forward-looking." Rather, it finds them to be statements about the present strength of the company and of its product. For example, Life Partners stated that "each life settlement transaction is structured with the goal of achieving the purchaser's target return and at a minimum, a positive return even if the insured outlives their LE prediction"; and that "[b]ecause of [Life Partners'] unique busi-

ness model, our shareholders can own a growth stock that also pays a healthy dividend. There aren't many opportunities like that in today's market." (Am. Compl., ECF No. 42 at 104–05, para. 210; at 83, para. 176.) Such statements would not qualify for the protection of the safe harbor provision, which applies to forward-looking statements only.

■ Moreover, where many of the written statements do indeed reference the future health of the company and can therefore be considered "forward-looking," the Court finds that these statements are not accompanied by meaningful cautionary language. The Defendants insist that the following statements include cautionary language: Life Partners "predicted record earnings"; Life Partners "expects to report first quarter earnings"; and the "[r]esults for the quarter are expected to show a 33% increase in earnings." (Mot. to Dismiss, ECF No. 46 at 32) (alteration in original.) As the Fifth Circuit reiterated in *Lormand*, "Congress clearly intended that boilerplate cautionary language not constitute 'meaningful cautionary' language for the purpose of the safe harbor analysis." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 244 (2009). Rather, "[t]he requirement for 'meaningful' cautions calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland Sec. Corp.*, 365 F.3d at 372. Precisely what this Court finds to be materially misleading about the statements made in the press releases and conference calls is that they led investors in the company to believe that Life Partners brokered a safe product, and that it was therefore a stable company. Cautionary language that simply states that the company's expected earnings were "predictive"

or "expected" does nothing to counteract the implication that the company deals in an unreliable product. Insofar as the Defendants failed to discuss the risks associated with their particular method for calculating life expectancies, this Court finds these "predictive" statements to be boilerplate, as they lack any meaningful cautionary language that would "correct the false impression created by the [Defendants'] public statements." *Lormand*, 565 F.3d at 247; *see also Rubinstein v. Collins*, 20 F.3d 160, 167 (5th Cir.1994) ("Under our precedent, cautionary language is not necessarily sufficient, in and of itself, to render predictive statements immaterial as a matter of law.").

The Defendants also fail the second prong of the test. Under the second prong, the safe harbor provision does not extend to knowingly false forward-looking statements allegedly made by an individual defendant. *Lormand*, 565 F.3d at 244 ("The 'safe harbor' would apply only if 'the plaintiff fails to [plead] that the forward-looking statement . . . was made with actual knowledge . . . that the statement was false or misleading.'" (quoting 15 U.S.C. § 78u–5(c)(1)(A)–(B) (alterations in original))). Because the Plaintiffs clearly plead that Mr. Pardo and Mr. Peden had actual knowledge that the statements were false or misleading, these alleged statements would not qualify for the protection of the safe harbor provision.

Furthermore, in the case of company press releases, i.e., statements allegedly made by a "business-entity," the Plaintiffs adequately allege that several of the press releases were made by an executive officer of the company, namely, Brian Pardo. Finally, none of the oral statements made during the conference calls were accompanied by the appropriate cautionary language stating that "the actual results may differ materially from those projected in

the forward-looking statement." 15 U.S.C. §§ 77z–2(c)(2), 78u–5(c)(2).

■ Finally, the Defendants argue that the statements are mere "corporate puffery." "Non-actionable puffery are statements 'of the vague and optimistic type that cannot support a securities fraud action ... and contain no concrete factual or material misrepresentation.'" *Kaltman v. Key Energy Servs., Inc.,* 447 F.Supp.2d 648, 659–60 (W.D.Tex.2006) (quoting *Southland Securities Corp. v. IN-Spire Ins. Solutions, Inc.,* 365 F.3d 353, 372 (5th Cir.2004)). Because, as detailed above, the Court finds the Defendants' representations about the strength of its company and of its product to be material, it finds the Defendants' current assertion that these prior statements constituted mere corporate puffery to be lacking in merit.

Given the above, the Court finds that all of the Defendants' statements are actionable.

### 2. Scienter

The Defendants also argue that the Plaintiffs failed to adequately allege that any material misstatements and omissions were made with the requisite level of scienter. After carefully reviewing the amended complaint, the Court finds that the Plaintiffs have adequately done so.

■ With respect to each act or omission alleged to violate section 10(b), the PLSRA requires a plaintiff to "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added). In determining if there is a strong inference that a defendant acted with scienter, a court must follow three steps. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). First, the court "must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Id.* at 322, 127 S.Ct. 2499. Second, the court must consider the complaint in its entirety, including "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* The proper inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23, 127 S.Ct. 2499 (emphasis in original).

■ Third, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.* at 323, 127 S.Ct. 2499. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324, 127 S.Ct. 2499 (quoting *Fidel v. Farley,* 392 F.3d 220, 227 (6th Cir.2004)). However, it "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326, 127 S.Ct. 2499.

■ Actual knowledge, though, is not required to create a strong inference of scienter. Rather, conduct that is severely reckless satisfies the scienter requirement under section 10(b). *Nathenson v. Zonagen Inc.,* 267 F.3d 400 (5th Cir.2001). The Fifth Circuit defines this as "'limited to those highly unreasonable omissions or misrepresentations that involve not merely

simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Id.* at 408 (quoting *Broad v. Rockwell,* 642 F.2d 929, 961–62 (5th Cir. 1981)).

■■■■■■■ "Circumstantial evidence can support a strong inference of scienter." *Nathenson,* 267 F.3d at 410. For example, "personal financial gain may weigh heavily in favor of a scienter inference...." *Tellabs,* 551 U.S. at 325, 127 S.Ct. 2499; *see also Nathenson,* 267 F.3d at 411 (quoting *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1285–86 (11th Cir.1999)). And although motive alone is insufficient to constitute scienter, it can be relevant when considering the allegations collectively. *See Nathenson,* 267 F.3d at 411. It is important to note, though, that the absence of allegations of motive is not fatal to a scienter inference. *Tellabs,* 551 U.S. at 325, 127 S.Ct. 2499.

■■■■■■■ Furthermore, when a company is a single-product company, like Life Partners, the gravity of misrepresentations about the product to the public is strong evidence that the "danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Sanders v. John Nuveen & Co., Inc.,* 554 F.2d 790, 793 (7th Cir.1977); *see also Nathenson,* 267 F.3d 400 (finding that where the CEO of a company had made representations to the public that the company's single product was protected by a patent, when in fact it was not, the CEO knew or should have known that his product was in fact not covered by a patent); *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 342 (5th Cir.2008) (finding allegations to be probative of scienter where the alleged misrepresented information was suf-

ficiently important to the health of the company). Finally, "scienter must exist at the time the misrepresentation or omission allegedly occurred." *Magruder v. Halliburton Co.,* No. 05–CV–1156–M, 2009 WL 854656, at *8 (N.D.Tex. Mar. 31, 2009).

### a. Knowledge of Underestimated Life Expectancies

■■■■■ In support of scienter, the Plaintiffs first raise allegations that the Defendants knew that Life Partners was built upon an unsustainable business model based on underestimated life expectancy calculations. Specifically, they point to a quarterly report transmitted to the Board of Directors in February of 2003, where Life Partners' Audit Committee—an internal committee composed of independent directors—expressed concern that a number of policies were maturing at a slower rate than originally predicted in Life Partners' calculated life expectancies. In the report, the Audit Committee recommended that management consider commissioning an independent review of the situation to determine whether adjustments were needed to Life Partners' underwriting methodology. Pardo and Peden were both members of the Board of Directors at this time; however, despite receiving this recommendation, neither director initiated an independent review of the life expectancy calculations.

Additionally, beginning in 2003, Life Partners included data with its annual filings with the Texas Department of Insurance (TDI) that stated the difference between Life Partners' LEs and the actual lifespan of the individuals who had deceased and whose policies had matured. According to the Plaintiffs' analysis of the documents, the TDI reports filed between 2003 and 2009 reflected that for approximately 80% of matured policies, the insured individuals had outlived the life ex-

pectancy assigned them by Life Partners. These TDI reports were filed by Life Partners' legal department, which Peden oversaw.

In 2006, Life Partners authorized an investment firm interested in investing in a pool of life settlements brokered by Life Partners to conduct an inquiry into the company's methods. The firm concluded that Life Partners had failed to exercise the necessary oversight over Dr. Cassidy's life expectancy calculations because it failed to analyze their accuracy or provide feedback on his track record or methodology. It related its conclusions in February of 2006 to both Pardo and Peden in a written report, and it further recommended that Life Partners "track, analyze, and validate" the life expectancy calculations. Neither Pardo nor Peden followed up on this recommendation.

In addition, the Plaintiffs allege that data available to Pardo and Peden through the company's internal policy tracking system should have alerted them to the fact that Dr. Cassidy's life expectancy calculations were significantly underestimated. According to the Plaintiffs' own analysis of the data available as of February 28, 2006, the data revealed that 88% of the insured individuals covered by policies brokered by Life Partners had outlived Dr. Cassidy's life expectancy calculations. The Plaintiffs further allege that for the universe of policies from which Dr. Cassidy's success rate is measurable, it was evident by 2007 that 88% of the insured individuals had outlived Dr. Cassidy's LE estimation; by 2008 it was evident that 89% of the insured individuals had outlived Dr. Cassidy's estimates; by 2009, it was clear that 90% of the individuals had outlived Dr. Cassidy's estimate; and by 2010, data revealed that 91% of the insured individuals had outlived the life expectancy estimate generated by Dr. Cassidy. According to the Plaintiffs,

because the data giving rise to these statistics was available to the Defendants on their own company tracking system, they knew that Dr. Cassidy's LE calculations were significantly underestimated. In sum, the Plaintiffs allege that the Defendants knew from various sources that Life Partners used a flawed methodology in calculating LEs. And despite clear warnings of this, the Defendants neither modified their methodology nor warned the public about the flaws.

The Plaintiffs' allegations are sufficient to withstand a motion to dismiss. They create a strong inference of scienter, demonstrating that the Defendants knew that their statements to the public were materially misleading. Life Partners sold only one product—its secondary life insurance policies. Information concerning whether Life Partner's methodology, including Dr. Cassidy's life estimates, was accurate was extremely important to the success of Life Partners. In fact, Life Partners admitted as much in each of its 10–K statements, in which it wrote that its "[p]urchasers [d]epend on [its] [a]bility to [p]redict [l]ife [e]xpectancies and [s]et [a]ppropriate [p]rice[s]." (Am. Compl., ECF No. 42 at paras. 92, 105, 124, 166, 193.) In light of the Plaintiffs' allegations, it is difficult to believe that the Defendants did not know that the life expectancy calculations made by Dr. Cassidy were materially underestimated when the statements were made. At the very least, the information allegedly available made it so obvious that the LEs were underestimated that if the Defendants truly did not know, they were severely reckless in not knowing.

The Court is also unable to overlook the allegations that the company's fee structure provided a motive to underestimate life expectancy calculations for the policies it sold. With every policy sold, the company made a profit. Policies that carried a

higher rate of return on the investment sold for more money, and therefore for more profit. With the internal rate of return being directly affected by the maturation date of a policy, the company was uniquely positioned to *create* a higher rate of return by representing to investors that the policy would mature sooner than it would. And where investors were unaware of fees, Life Partners could successfully operate at a higher fee structure for many years. These high fees and lack of transparency make it highly implausible that the Defendants did not know that Life Partners' way of conducting business diverged from the industry standard, especially when considering other information available to the Defendants.[12]

The Defendants, however, argue that even if Dr. Cassidy's life expectancy estimates were underestimated, this could not have possibly become clear to the Defendants until 2004. Because Dr. Cassidy did not begin to estimate life expectancies until 1999, and his average life expectancy for those calculations made between the years 2000 and 2004 was 3.8 years, it would not have become apparent to the Defendants that the life expectancy calculations were systematically underestimated until at least 2004, when insured individuals were not passing away at their anticipated dates of death. Thus, it would have been impossible to act with scienter. And at best, even if it was clear by 2002 that the company's life expectancy calculations were shorter than anticipated, these LE calculations in question would have been those rendered by Dr. Cassidy's predecessor, Dr. Kelly, and not by Dr. Cassidy himself. The amended complaint, however, only alleges that the Defendants knew or should

have known that Dr. Cassidy's LEs were routinely underestimated.

The Defendants also contend that an analysis of the data contained in the Texas Department of Insurance Reports does not in fact reveal the LEs to be materially underestimated. In support, the Defendants included exhibits of each of the annual reports and urge the Court to take judicial notice of them. (*See* Hearing Transcript at 22 (arguing that because the TDI reports are "specifically referenced in the [amended] complaint, the Court can take judicial notice of those TDI reports").) According to the Defendants' own analysis, the reports "establish that 45.6% of the matured policies from 2003–2009 that were arguably based on Dr. Cassidy's LEs actually matured before, or in the month of, the estimated LE." (Mot. to Dismiss, ECF No. 46 at 25–26.) Referencing a district court case in the Ninth Circuit, the Defendants further argue that because " 'the court need not accept as true allegations contradicted by judicially noticeable facts,' " and because the TDI reports contradict the allegations contained in the amended complaint, the Court need not accept these allegations as true. (*See* Reply, ECF No. 51 at 11, n. 14 (quoting *Mendoza v. Lehigh Southwest Cement Co.*, No. 11–CV–01286–CHK, 2012 WL 1534754, at *3–4, 2012 U.S. Dist. LEXIS 60947, at *10 (N.D.Cal. May 1, 2012)).)

The Court finds these arguments to be unpersuasive. First, the Audit Committee report from 2003 clearly states:

[D]iscussion was held regarding the small number of policies paying off during the nine months ended November 30, 2002. Based on these discussions,

---

**12.** Again, according to the amended complaint, Life Partners took fees that were more than 14% of a policy's face value, and therefore significantly higher than the market average of " 'lesser of 6% of a policy's face value or 30% of the gross sales price.' " (Am. Compl., ECF No. 42 at 2, para. 5.)

the Committee recommended discussions with management about obtaining an independent review of this issue to determine whether adjustments are necessary to the Company's underwriting criteria.

(Am. Compl., ECF No. 42 at 24, para. 70.) Based on the plain language contained in the report, the Audit Committee was concerned by 2003 that Life Partners' life estimates were, on average, shorter than the insureds' lifespans. Furthermore, the committee presented this concern to management, thus putting the Defendants on notice of potential inaccuracies in the LEs.[13]

Even if the report partially or even fully relied on the LEs calculated by Dr. Kelly, rather than by Dr. Cassidy himself, the primary issue in 2003—and in general—was whether the Defendants had knowledge that the company's methodology was flawed. The allegations in the complaint clearly state that Dr. Cassidy was told by Pardo to continue following Dr. Kelly's methodology. (Am. Compl., ECF No. 20, para. 58.) Thus, if the report indicated that Dr. Kelly's methodology was flawed, then the Defendants were put on notice that Dr. Cassidy's methodology was also flawed.

 The Court likewise finds the Defendants' own analysis of the data contained within the Texas Department of Insurance Reports to be unpersuasive. In ruling on a motion to dismiss, courts may indeed consider matters of which they may take judicial notice. *See* Fed.R.Evid.

201(d) ("The court may take judicial notice at any stage of the proceeding."). However, the Court may not take judicial notice of a fact that is "subject to reasonable dispute." Fed.R.Evid. 201(b). After carefully considering the Defendants' attached exhibits concerning the reports, the Court concludes that an analysis of the dozens of pages detailing the life insurance policies sold by Life Partners over the years falls more appropriately within the purview of an expert witness properly presented at a later stage of the civil action.

In so determining, the Court finds persuasive the Fifth's Circuit determination in *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1018 (5th Cir.1996), concerning public filings with the SEC. In *Lovelace,* the Fifth Circuit explicitly held that "[w]hen deciding a motion to dismiss a claim for securities fraud on the pleadings, a court may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC. Such documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents." 78 F.3d at 1018; *see also In re Am. Apparel, Inc. S'holder Litig.,* 855 F.Supp.2d 1043, 1064 (C.D.Cal.2012) ("In addition, plaintiffs appear to seek judicial notice of the truth of the documents' contents, suggesting that the court can infer scienter from the number of substantive violations reported in the documents. Doing so would be

---

**13.** "The Court may ... consider documents 'integral to and explicitly relied on in the complaint,' that the defendant appends to his motion to dismiss, *as well as the full text of documents that are partially quoted or referred to in the* complaint." *In re Enron Corp. Sec., Derivative & "Erisa" Litig.,* MDL 1446, 2003 WL 23316646 (S.D.Tex. Mar. 27, 2003) (emphasis added) (quoting *Phillips v. LCI Intern.,* *Inc.,* 190 F.3d 609, 618 (4th Cir.1999)) (citing *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808–09 (2d Cir.1996)); *see also San Leandro,* 75 F.3d at 808 ("[W]e considered the full contents of a prospectus deemed "integral" to the complaint "despite the fact that the complaint contains only 'limited quotation' from that document." ").

inappropriate in the context of a motion to dismiss under Rule 12(b)(6).").

Similarly, while the TDI reports are not public disclosure documents required to be filed with the SEC, the Court finds that it is not in a position to properly consider the *contents* of the reports in order to prove the truth that the majority of the policies issued by Life Partners during the referenced years carried accurate, or inaccurate, life expectancy estimates. Because the Court cannot take judicial notice of anything other than the existence of the TDI documents and the fact that they indeed list the policies sold by the company with accompanying data for each policy, it cannot find that the contents of the documents in fact refute the Plaintiffs' allegations.

The Defendants, however, alternatively argue that the Plaintiffs' own analysis of these reports should not be taken as true for the reason that "Fifth Circuit authority ... prohibits allegations of purported company reports or records without 'corroborating details regarding the contents of the alleged[ ] ... reports, their authors and recipients.'" (Reply, ECF No. 51 at 11 (quoting *Abrams v. Baker Hughes, Inc.,* 292 F.3d 424, 432 (5th Cir.2002)).) In *Abrams,* the Fifth Circuit held that "[a]n unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss." *Abrams,* 292 F.3d at 432. Because the plaintiffs could point "to no specific internal or external report available at the time of the alleged misstatements that would contradict" the reported accounts,

the Fifth Circuit found no inference of scienter. *Id.*

Here, though, the Court finds that the Plaintiffs refer to concrete Texas Department of Insurance reports which are not generic but specific, which were available at the time of the alleged misstatements, and which were produced as exhibits by the Defendants.[14] Accordingly, the Court must take the Plaintiffs' allegations as true: that for the policies that matured between 2003 and 2009, the life estimates were routinely underestimated, as "approximately 80% of matured policies that the Company brokered had outlived Cassidy's LEs." (Am. Compl., ECF No. 42 at 24, para. 72.)

### b. Insider Trading

The Plaintiffs have also alleged that Mr. Pardo and Mr. Peden's unusual trading habits indicate that they were aware of the unsustainability of Life Partners. According to the Plaintiffs, the Defendants knew by the end of the 2006 fiscal year that the LEs were systematically underestimated. With this insider information, Pardo and Peden traded on this material, non-public information to profit off the company before the public became aware of the unsustainability of Life Partners' business model. Thus, these actions also create a strong inference of scienter.

Pardo sold 457,102 shares of Life Partners stock between February 12, 2007, and January 8, 2009, via fifteen transactions, for a total of $11.2 million. Thirteen of fifteen of Pardo's trades were made at above $26 a share. Peden, in turn, sold $300,000 in shares of his personal stock on

---

**14.** While the Court recognizes that the Plaintiffs admit in a footnote that they were once unable to obtain these "confidential" records, they nevertheless explain their source for the information contained therein, and since obtaining the reports, they have not changed their argument that the contents of the reports support a finding that a majority of the life expectancy estimates were underestimated for the brokered policies reported between 2003 and 2009 to the Texas Department of Insurance.

June 18, 2007, at $30.17 per share. During the trading period, the stock price ranged from $10 a share on February 12, 2007, to $43.50 a share on January 8, 2009. Even though the Defendants did not necessarily trade at Life Partners' peak value, they still profited significantly.

Pardo's sell-off of his stock still left him with 7,502,084 shares, or 50.3% of all Life Partners shares, which was enough to maintain control over the company. As the controlling shareholder, Pardo then declared regular dividends of 25 cents per share beginning on August 5, 2009, and lasting until November 3, 2010. Prior to this time frame, between May 2007 and May 2009, all of Life Partners' regular dividend declarations remained between six and seven cents per share. Pardo justified the increase in dividends based on Life Partners' soaring stock prices, claiming that stock investors deserved to share in the company's wealth and success. In all, between May 2007 and May 2011, Brian Pardo received $20,933,815.19 in dividend payments.

To protect his financial interests in Life Partners, Pardo formed a trust in Gibraltar—a well-known asset protection haven—called "Pardo Family Holdings, Inc." All of Pardo's stock went into the trust, and the money derived from the dividends also went into the trust. According to the Plaintiffs, Pardo knew that Life Partners' failure was inevitable, so he devised a scheme to systematically divert Life Partners' profits into a fund that would be protected from creditors in the event of Life Partners' failure.

 After reviewing these allegations, the Court finds that they raise a strong inference of scienter on the part of Pardo, but not Peden. "[A]llegations of insider trading are essentially a form of motive and opportunity allegations." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,*

365 F.3d 353, 368 (5th Cir.2004). And while "allegations of motive and opportunity" are alone insufficient to support an inference of scienter, they "may meaningfully enhance the strength of the inference of scienter." *Id.* This is only true, though, when allegations of insider trading involve trading at " 'suspicious amounts or at suspicious times.' " *Id.* (quoting *Abrams,* 292 F.3d at 435).

The Defendants, in fact, argue that the Plaintiffs' allegations do not involve trading in "suspicious amounts or at suspicious times." They argue that the trades made by Pardo occurred over a two-year period of time. According to the Defendants, the sheer length of the trading period, coupled with the fact that the Plaintiffs fail to show how the trades made during this period of time were calculated to maximize profits, do little to support an inference that the Defendants had knowledge that Dr. Cassidy's life estimates were underestimated and created an unstable company. They further point out that Pardo waited an entire year to first sell stock, rather than immediately after early 2006 when he purportedly first became aware that Life Partners' business model was unsustainable. Similarly, Peden's trade of $300,000 worth of stock occurred more than sixteen months after he first allegedly became aware that Life Partners systematically underestimated its life expectancy estimates. The fact that both the Defendants waited an entire year or more to act on this information is, in the Defendants' view, an indication that they never acted on this information at all. The Defendants further claim that "[c]onspicuously absent from the [c]omplaint ... are any allegations about Peden and Pardo's trading history." (Mot. to Dismiss, ECF No. 46 at 15.) Accordingly, they argue that the Court will be unable to "determine wheth-

er trades are 'out of line with prior trading practices.' " (*Id.*)

The Court disagrees with Pardo, but not with Peden. In determining whether a defendant has engaged in unusual or suspicious insider stock sales, "[a]mong the relevant factors to consider are: (1) the amount and percentage of shares sold by [the] insider[ ]; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999). The Plaintiffs have alleged that as early as 2003, the Defendants knew that Life Partners' LE calculation methodology was potentially unsound and needed to be reviewed. In March of 2007, not long after a due diligence consultant also advised that Dr. Cassidy's methodology needed to be reviewed, the company began to trade publicly on the NASDAQ exchange. Mr. Pardo thereafter slowly but surely divested himself of 30% of his share in the company. To sell one's 30% share in a company is no minor decision, but rather a deliberate course of action. And whether or not Pardo sold his stock at Life Partner's peak stock value, he still profited greatly from shares that were once valued at significantly less than $26 a share. (See Am. Compl., ECF No. 42 at 3–4, para. 9 (alleging that the company's stock price soared from $2.19 per share (split-adjusted) prior to the start of the Class Period to more than $22.50 per share in early 2009).)

Furthermore, to sell such a large portion of one's share in a company after receiving the above clues that the company may not be sustainable is highly suspicious. While the Court recognizes that Mr. Pardo's motivation to sell such a significant portion of his holding *may* have arisen from an innocent desire to maximize on the company's initial public offering, the Court finds there to be an equally compelling explanation for his behavior: Pardo deliberately sold millions of dollars of shares knowing that Dr. Cassidy's life expectancies were routinely underestimated and that the company was not sustainable in the long-run.

By contrast, the Court finds Defendant Peden's one-time sale of stock shortly following Life Partners' initial public offering to be in and of itself unsuspicious. The Plaintiffs have provided no allegations regarding how much stock Peden actually owned or how much he acquired the stock for. Without more information, there is nothing inherently suspicious about the timing of the sale itself, or the amount of the sale of $300,000. Although there are indeed other allegations to support an inference of knowledge on Peden's part, his one-time sale of stock does not support such an inference.

As for the dividend payments, the Defendants argue that such allegations do not suffice to plead scienter, as dividend payments are a benefit that is common to all shareholders, and there is no nexus sufficiently personal to either Defendant that would support an inference of scienter. *See Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 544 (5th Cir.2008) ("Scienter in a particular case may not be footed solely on motives universal to corporate executives."). In making this argument, the Defendants rely on what they assert is an analogous case, *In re Yukos Oil Co. Securities Litigation*, No. 04–CIV–5243 (WHP), 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006). In *In re Yukos Oil*, the plaintiffs alleged that the defendants violated federal securities laws by failing to make disclosures, overstating reported profits, and understating tax liability. *Id.* In making out their case for scienter, the plaintiffs argued that one defendant personally received 28% of the company's dividend

payments, thereby supporting an inference of motive and opportunity. The *Yukos* court disagreed, holding that where the defendants benefitted in the same way as all stockholders and merely passively maintained stock and received benefits, the mere fact of receiving dividends was insufficient to give rise to an inference of scienter. *In re Yukos Oil*, 2006 WL 3026024, at *19 ("The Complaint alleges merely the passive maintenance of stock positions and the receipt of dividends in due course, not "unusual insider trading activity during the [C]lass [P]eriod." ").

*Yukos* does indeed work in Peden's favor. With no information about the percentage of stock Peden owned, it is impossible to determine how much Peden profited from the dividends. But given the present set of facts, *Yukos* is too dissimilar to be persuasive with regards to Pardo. Mr. Pardo owns 50.3% of the company's shares, not simply 28%. Taking the Plaintiffs' allegations as true, this means that (1) he had the power to unilaterally declare dividends, and (2) he took home a disproportionate share of those dividends. So while his declaration does indeed inure to the immediate benefit of other shareholders, who also received dividends, Pardo's trading behavior is far from "the passive maintenance of stock positions and the receipt of dividends in due course." *In re Yukos Oil*, 2006 WL 3026024, at *19.

Furthermore, the Fifth Circuit has recognized that "[i]ncentive compensation packages ... in conjunction with other scienter allegations" can be probative of an inference of scienter in "extraordinary cases." *See Shaw*, 537 F.3d at 544. And relevant to the present set of facts, other courts have recognized that, like incentive compensation packages, dividend declarations in conjunction with other facts can too be probative of scienter. *See, e.g., In*

*re New Century*, 588 F.Supp.2d 1206, 1232 (C.D.Cal.2008) ("A motive to defraud based on compensation incentives such as bonuses and dividends also may strengthen an inference of scienter."). Given this, the Court indeed finds the declaration of dividends under the present set of facts to be unusual and, even if not sufficiently indicative of scienter, at least probative on this issue.

Finally, the Defendants weakly argue that because Pardo never increased his holdings prior to declaring a special dividend, nor decreased them just after declaring one, there is nothing suspicious about the dividend declaration itself. This argument, however, does nothing to contradict the Plaintiffs' claim that the Defendants had special knowledge about the unsustainability of Life Partners as a whole. No doubt, if Pardo had in fact increased his shares in the company just before declaring a dividend, this act alone might have constituted suspicious trading activity giving rise to an inference that the Defendants knew about the imminent declaration of a special dividend. The lack of such behavior, however, is not relevant to this Court's inference that the Defendant's knew, or were reckless in not knowing, that the company was unsustainable due to systematically underestimated life expectancy estimates.

**c. Misrepresentations About Life Partners' Income Recognition Policy**

The Plaintiffs also allege that Life Partners' material misrepresentations about their income recognition practices create a strong inference that the Defendants knew of Life Partners' overinflated value. In support, the Plaintiffs point to Life Partners' 10–KSB and 10–K forms, which state that (1) its "consolidated financial statements ... were prepared in accordance

with accounting principles generally accepted in the United States of America," and (2) Life Partners "recognize[s] income at the time the settlement [is] closed and the purchaser [is] obligated ... to make the purchase." (Am. Compl., ECF No. 42 at 31–32, para. 90). In each quarterly report filed for the 2007–2011 fiscal years, Pardo, as President and CEO, also stated that the report "fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the periods covered in the Report," and certified that Life Partners' internal controls were effective. (*Id.* at 35, para. 94; 36, para. 96; and 37, para. 98.)

Despite these representations, the Plaintiffs allege that as early as 2003, Life Partners had begun to recognize revenue on a basis inconsistent with its stated revenue recognition policy, and that its practices were not in compliance with GAAP or SEC regulations. According to the Plaintiffs, when Life Partners reached a potential agreement with a policyholder to sell his or her life insurance policy, the policyholder returned to Life Partners executed copies of what is called the "seller agreement." The seller agreement became binding only upon the "closing date" of the transaction, which occurred at the time the seller received full consideration for the policy. Prior to the closing date, either the seller of the policy or Life Partners could rescind the transaction without penalty. Furthermore, for up to fifteen days following the closing date, the original policyholder reserved the right to rescind the seller agreement for any reason.

Life Partners had a policy of engaging in two practices that resulted in the early recognition of revenue in violation of GAAP and SEC regulations. First, quoting an internal memo written by Brian Pardo, CEO, to David Martin, CFO, the Plaintiffs allege that Life Partners actually had a policy of " 'clos[ing] the book and records for a quarter on or about 15 business days after the end of the quarter.' " (Am. Compl., ECF No. 42 at 128, para. 251.) Thus, if an investor committed to purchasing a policy in the first fifteen days of a quarter, the Defendants would backdate the profits realized from the purchase agreement to the previous quarter, even if the agreement had not yet closed and could still be rescinded. Second, when a secondary purchaser of a life insurance policy had committed to purchasing only a pro rata share in the policy, the company would record the income it expected to receive from the pro rata share upon the execution of the seller agreement, but prior to selling one hundred percent of the interests remaining in that policy. The sale of the policy, however, could not be closed until the company sold all of the interests in the policy.

Given this, the SEC reports were misleading because they did not actually comply with GAAP regulations, which require income to be reported as it is actually earned. Specifically, under GAAP regulations, a person cannot report revenue until it is both (1) realized or realizable, and (2) earned. Revenues only qualify as realizable when they can be readily converted into cash, and they only become "earned" when a company "has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." (*Id.* at 127, para. 248.) Neither of these prongs is satisfied, however, until the original policy owner is paid by the escrow agent for the sale of the policy, which does not occur until the closing date, at the very earliest. (*Id.* at 126–27, paras. 247–48.) The reports were also misleading because, according to the Plaintiffs, they failed to reveal that there was "more than a remote likelihood that a material misstatement to the annual or interim financial statements could occur and not be prevented or de-

tected by the Company's internal controls in a timely manner." (*See id.* at paras. 93, 106, 114, 117, 131, 136, 145, 173, 174, 179, 183, 194, 197, 204, and 206 (quoting Ernst & Young resignation letter dated June 9, 2011).)

In alleging scienter, the Plaintiffs allege that Pardo and Peden intentionally provided the company's outside auditor with erroneous information about Life Partners' income recognition policy in 2004. First, when soliciting revenue recognition advice, Pardo and Peden allegedly presented Life Partners' outside auditor with false information concerning the steps the company took in closing a transaction, failing to inform the auditor of a seller's rescission rights under a seller agreement. Second, Pardo and Peden instructed the auditor to "assume" that Life Partners always fully funded a policy prior to recognizing revenue received therefrom. The auditor then advised Pardo and Peden based on these false assumptions and information.

Life Partners thereafter adopted a policy of (1) recognizing revenue prior to the finalization of a policy's sale, and (2) recognizing revenue prior to selling a one hundred percent interest in a policy, both in violation of GAAP principles. In 2010, Pardo and Peden memorialized the company's policy based on this 2004 advice in a memorandum addressed to Martin and others. Finally, Life Partners routinely backdated its closing dates so that its outside auditors would not realize that the company recognized revenue prior to such dates. Because the Defendants provided false information, the outside auditors concluded that Life Partners' income recognition was proper and accurate and signed off on its financial statements.

The Plaintiffs further allege that Pardo, Peden, and Martin monitored all aspects of the process by which Life Partners processed the contracts and recorded its reve-

nue realized on each contract. As the CFO and head of the Accounting Department, Martin processed Life Partners' quarterly book entries in which Life Partners logged its revenues realized from that quarter. Pardo and Peden monitored the funding status of the contracts both from sellers and investors. Because of their integral role with the company, Pardo, Peden, and Martin therefore knew of the misrepresentations about Life Partners' income recognition policy.

The Plaintiffs also claim that the Defendants misrepresented the values of repurchased policies owned by Life Partners, Inc., thus artificially inflating the value of Life Partners. According to the Plaintiffs, between 2007 and 2009, Life Partners bought back policies from certain investors to settle a legal dispute, knowing that the life expectancy estimates calculated by Dr. Cassidy were underestimated. Under standard accounting practices, where a company expects to hold an asset for longer than a year, it must test the asset "for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable." (Am. Compl., ECF No. 42 at 130, para. 257.) Furthermore, "an impairment loss shall be recognized if the carrying amount is not recoverable and exceeds its fair value," with fair value being "the price that would be received to sell an asset in an orderly liquidation." (*Id.* at 130, para. 258.)

Life Partners, however, allegedly actually estimated the fair value of the policies to be the lesser of either the *cost* at which Life Partners re-purchased the policy, or 75% of the face value of the policy. When the price of the policy was greater than 75% of the face value, instead of calculating an impairment according to standard accounting principles and determining the present value of the policy based on an updated life expectancy analysis, Life

Partners simply wrote off the difference between the cost and 75% of the face value as a settlement expense.

Life Partners later represented to the SEC on its financial disclosures that it "evaluated the carrying value of its investments in policies on a regular basis 'using new or updated information that affects our assumption about remaining life expectancy, credit worthiness of the policy issuer, funds needed to maintain the asset until maturity, capitalization rates and potential return.'" (*Id.* at 130, para. 260.) The company even stated in its filings that impairment is "generally caused by the insured significantly exceeding the estimate of the original life expectancy, which cause the original policy costs and projected future premiums to exceed the estimated maturity value." (*Id.* at 130, para. 261.) But according to the Plaintiffs, between 2009 and 2010, Life Partners never reevaluated the fair value of its re-purchased policies. This blatant misrepresentation of Life Partners' practices, argue the Plaintiffs, is further evidence of scienter.

As even more evidence of scienter, the Plaintiffs allege that the Defendants deceived their outside auditor, Ernst and Young (E & Y), in mid–2010 when E & Y requested data from Life Partners regarding its life expectancy estimates in order to evaluate the company's impairment calculations. According to the Plaintiffs, the Defendants tendered a chart of the "most recent 300 maturities" sold by Life Partners, which indicated that there was a roughly fifty-fifty split between policies that matured before Dr. Cassidy's predicted date of death, and those that matured after. However, in selecting for the 300 most recently matured policies, the Defen-

dants selectively excluded 1200 unmatured policies for which the insured individuals had already outlived Dr. Cassidy's predicted date of death. Furthermore, E & Y thereafter wrote a letter to Life Partners' Audit Committee noting that the company had no "formal process in place to assess actual-to-expected LEs." (Am. Compl., ECF No. 42 at 132–33, para. 265.) It recommended that management conduct a formal analysis of its process.[15]

In early 2011, however, it became clear that Life Partners' revenue recognition policies were not in line with GAAP and SEC regulations. Accordingly, E & Y informed the Defendants that they needed to revise its income reporting practices immediately, further advising Life Partners that it could not sign off its annual financial reports for the 2011 fiscal year. In response, Pardo threatened E & Y, stating that he would "take action." (Am. Compl., ECF No. 42 at 116, para. 227.) Feeling that its independence had been compromised, E & Y stepped down as Life Partners' independent auditor. In doing so, E & Y also disclaimed its prior reports from 2010, claiming that they were unreliable based on the newly provided information. Shortly thereafter, on June 17, 2011, Eide Bailly, one of Life Partners' previous outside auditors, likewise disclaimed its prior clean audit of the company's 2009 financial statements.

Despite the numerous allegations of scienter, the Defendants in support of dismissal cite *Abrams,* 292 F.3d 424, and argue that the mere allegation of GAAP violations does not in and of itself support an inference of scienter—i.e., an inference that a defendant knew or should have known that the company's financial state-

---

15. The Court finds this allegation alone—that the directors so carefully selected their sample set to include only the recently matured policies—to add to an inference that the De-

fendants were aware that Dr. Cassidy's predictions were miscalculated and underestimated.

ments reported false revenues on account of the company's failure to follow general accounting procedures. The Defendants further argue that the Plaintiffs fail to allege that any of the Defendants actually participated in the misallocation of revenue, or had knowledge that employees were either improperly recognizing revenue or were backdating documents.

Taking the allegations in the aggregate, the Court finds that sufficient facts have been pleaded to support an inference that the Defendants knew or should have known that their revenue recognition policies were inaccurate. The Plaintiffs do not merely allege GAAP violations. Instead, the allegations indicate that Peden and Martin intentionally manipulated the company's outside auditors to convince them that Life Partners' LEs and impairment calculations were sound.[16] Not only did the Defendants violate GAAP and SEC standards in recognizing income, but Pardo and Peden convinced Life Partners' auditors otherwise by providing inaccurate information via false hypotheticals. This created a scenario where the public was misled into believing that Life Partners followed established accounting practices, thus giving the immediate appearance of wealth and stability.

In sum, the Plaintiffs have adequately pleaded scienter. Although the Defendants make many arguments to the contrary, it is important to note that the Court must look to the allegations as a whole, not in isolation as the Defendants do. The Plaintiffs point to various examples that indicate actual knowledge of material misrepresentations to the public, including internal reports, public reports, insider trading, auditor manipulations, and falsified SEC filings. These allegations, combined with Life Partners' clear motive to maximize profits under an unsustainable business model while it still could, are more than sufficient to support an inference that the Defendants knew or were severely reckless in not knowing that (1) its method of generating life expectancy estimates was not in conformity with industry standards, (2) its life expectancy estimates were routinely underestimated, and (3) its income reporting was materially misleading.

The Defendants, however, make one final argument regarding scienter. They argue that the Plaintiffs failed to sufficiently plead false and misleading statements as to each individual defendant, and instead rely on "group pleading," a doctrine that the Fifth Circuit has rejected.

 According to the Fifth Circuit, "the PSLRA requires the plaintiffs to 'distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud.'" *Southland Sec. Corp.*, 365 F.3d at 365 (5th Cir.2004) (emphasis in original). Essentially, "corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles." *Id.* Thus, the Court must

---

**16.** Additionally, the Plaintiffs allege, and the Court is inclined to agree, that the very fact that Life Partners considered the fair value of the policies that it repurchased and held until maturity to be the value of either the lesser of (1) the purchase price, or (2) 75% of the face value of the policy, contributes to an inference that the company did not expect the individuals to pass away at their originally anticipated dates. And while the Court recognizes that surely the fair market value of a repurchased policy could not be worth the face value of the policy where the company must continue to pay premiums on those policies, therefore probably warranting a discount of some amount, the Court suspects, without having any concrete numbers before it, that a person would only discount a policy by 25% if he or she expected to have to pay a significant number of future premiums towards that policy before profiting from its maturation.

look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.

*Id.* at 366. "Consequently, 'it is only necessary ... to address the allegations claimed to adequately show [scienter] on the part of the [named officers]' to determine whether the complaint sufficiently pleads scienter." *Ind. Elec. Workers' Pension Trust,* 537 F.3d at 533–34 (quoting *Southland Sec. Corp.,* 365 F.3d at 367).

After reviewing the alleged misrepresentations, the Court finds that the Defendants adequately identify Pardo, Peden, and Martin as active participants in making the misleading statements relevant to this action. Accordingly, the Court is not persuaded by the Defendants' argument that the Plaintiffs inappropriately rely on group pleading.

### B. Section 20(a) Claims

The Defendants also argue that the Plaintiffs have failed to state a claim under section 20(a) of the Exchange Act. Section 20(a) provides, "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable. ..." 15 U.S.C. § 78t(a).

The Defendants' sole argument in support of dismissal is that because the Plaintiffs have failed to adequately plead a primary violation by any "controlled person," the Court should dismiss the derivative section 20(a) claim as well. *See Southland,* 365 F.3d at 383 ("Control person

liability is secondary only and cannot exist in the absence of a primary violation.") The Court, however, has found the Plaintiffs' section 10(b) and Rule 10b–5 claims to be adequately pleaded. Because the Defendants have briefed no additional argument as a basis for dismissal, the Court likewise denies their motion to dismiss the section 20(a) claims.

### IV. CONCLUSION

Having carefully reviewed the amended complaint, as well as the pending motion to dismiss and responses thereto, it is this Court's judgment that the Plaintiffs have set forth in sufficient detail facts giving rise to more than a mere plausibility that the Defendants have violated section 10(b) and section 20(a) of the Exchange Act, as well as SEC Rule 10b–5. Therefore, it is hereby **ORDERED** that the Defendants' motion to dismiss (ECF No. 46) is **DENIED.**